# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 2000-CA-02025-COA

**IN RE: ESTATE OF WILLIAM GEORGE LAW, DECEASED: DOLORES CLUNEY A/K/A DOLORES LAW**                    **APPELLANT**

**v.**

**JOHN DAVID LAW, ADMINISTRATOR**                    **APPELLEE**

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 11/09/2000 |
| TRIAL JUDGE: | HON. JACQUELINE ESTES MASK |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | C. MICHAEL MALSKI |
| ATTORNEY FOR APPELLEE: | J. DUDLEY WILLIAMS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| TRIAL COURT DISPOSITION: | CONVEYANCE OF LAND SET ASIDE ON THE BASIS OF FRAUD |
| DISPOSITION: | REVERSED AND RENDERED - 06/11/2002 |
| MOTION FOR REHEARING FILED: | 7/10/2002; denied 9/24/2002 |
| CERTIORARI FILED: | |
| MANDATE ISSUED: | |

BEFORE SOUTHWICK, P.J., THOMAS, AND IRVING, JJ.

SOUTHWICK, P.J., FOR THE COURT:

¶1. The chancellor cancelled as fraudulent a deed to the appellant from a man who thought that she was his wife. In fact, the appellant had a hidden existing marriage. On appeal the non-wife argues that regardless of this misrepresentation, there was no proof that the fraud caused the conveyance. We agree that there was substantial evidence that the appellant had misrepresented her martial status to the deceased who thought he had married her. The deception was continued for a time even in this suit. Still, there was no evidence that the grantor deeded the property only because he thought he was married to the grantee. We therefore reverse and render.

## FACTS

¶2. George Law was married to Geraldine Law when she died in 1989. Mr. Law then met Dolores Cluney

in 1992. There was testimony from one of Law's sons that appears to state that Cluney lived nearby in a small trailer and perhaps foraged for food from a dumpster. She would come to Law's backdoor wanting to borrow cigarettes, sugar, or use the telephone. There was evidence introduced that she was receiving Social Security Administration disability payments, and that she was easily confused by a variety of matters, including finances. She was described as being of low intelligence, with one witness comparing her to a twelve- year- old. Cluney began to provide company for the older man, who was growing blind and had a variety of other physical problems. Law and Cluney lived together beginning in September 1992. On January 8, 1994, they underwent a marriage ceremony. Mr. Law was about 73 years of age and Cluney was 40. This marriage was invalid because Cluney had a prior undissolved marriage.

¶3. There was evidence that Cluney left Law three times. The first was for about seven days and was before the wedding. She then left again sometime after the wedding. It was after her second return that Law conveyed her a survivorship interest in the house. She last left him when or perhaps just before he went into the hospital in 1999, but she returned before he died.

¶4. Approximately six months after the 1994 wedding, Law conveyed his residence, which included a one acre lot on which his home was located, to himself and Cluney as "joint tenants with full rights of survivorship and not as tenants in common." Law died intestate in 1999. At that time, he also owned about 190 acres of farmland that was inherited by his children. His son, John Law, was appointed the administrator for his estate. Shortly thereafter, John Law petitioned the court to have the deed set aside and the purported marriage declared void.

¶5. Cluney made several misrepresentations to the court during the initial stages of these proceedings, when the administrator was unaware of her former marriage. It was established that Cluney made false statements about her marital status, her level of education, and about the use of the name, Dolores Cluney. The former marriage was to a Raymond Cluney, which occurred in 1972 when the bride would have been about nineteen years old. Dolores Cluney in these proceedings testified that the couple lived together only for a month. There is mention in the administrator's brief that a secretary for the estate attorney first made the connection between Dolores Spadoni Law, as she was known to Mr. Law, and a Dolores Cluney who had sought to have her "common law husband" Timothy Johnson committed to the state mental hospital in 1992. Regardless of the source of the information, once the administrator became aware of these questions, an investigation into Cluney's background was undertaken. When these issues first came to the fore, the appellant denied that she was the Dolores Cluney who had signed the commitment papers on Johnson. Later she admitted her role in the Johnson commitment.

¶6. The chancellor granted partial summary judgment by setting aside all of Cluney's inheritance rights. No error is alleged in that decision. A trial was later held that led to the chancellor's setting aside the deed and establishing a constructive trust for the benefit of the heirs. Cluney appeals.

## DISCUSSION

¶7. Cluney's sole assertion of error is that the administrator failed to prove that fraud underlay the conveyance. She argues that there was no proof that Law's belief that the two were married was the reason for the conveyance of the house and land.

¶8. These are the requirements for setting aside a conveyance based on fraud:

> The elements of fraud, which must be proven by clear and convincing evidence, include: 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity or ignorance of its truth; 5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; 6) the hearer's ignorance of its falsity; 7) his reliance on its truth; 8) his right to rely thereon; and 9) his consequent and proximate injury.

*Levins v. Campbell*, 733 So. 2d 753, 761-62 (Miss. 1999). It is obvious that the misrepresentation alone, even of a matter as significant as this, is not enough to invalidate the deed.

¶9. The chancellor quoted these factors in her opinion, but then did not make findings on all of them. The chancellor's opinion primarily relied on the fact that a fraudulent marriage occurred. There at least was a finding that the misrepresentation was material to the conveyance:

> Based on the totality of the situation and the credible proof, Dolores made a false representation as to her marital status and this representation was material to [Law] deeding an interest in his real property to her. It was only after six months of a purported marriage that a deed was executed and the deed itself refers to Dolores as [Law's] wife in two locations in the document. Where one party (in this case, Dolores) knows of an impediment to marriage and practices fraud on the other, . . . there is no reason why this fraud should not vitiate the gift. Accordingly, this Court grants the relief requested and does hereby set aside the transfer based on fraud from [Law] and Dolores . . ..

¶10. Proof of the elements of fraud must be by clear and convincing evidence. *Id.* at 761. We look to the record to determine what evidence existed on these factors. Though there are not findings on each factor, we can in a non-domestic relations case imply the findings on contested evidence necessary to uphold the decision unless there are indications that the chancellor was not applying the correct legal principles. *Watson v. Lillard*, 493 So. 2d 1277, 1279 (Miss. 1986)("where the trial judge did not make specific findings of fact with regard to controverted issues, this Court will assume that the trial judge made all findings of fact that were necessary to support his verdict"). The chancellor set out these same factors as being necessary for proof of fraud, then found that fraud was proven. Therefore, we will imply the necessary findings if there is evidence to support them.

### A. Representation.

¶11. Proof that Cluney knowingly misrepresented the fact that she was not married was shown. For a time Cluney argued that she forgot about the former marriage, but no serious dispute exists on appeal that a knowing misrepresentation was made. Not only did Cluney not disclose her marital status to Law, she committed perjury during her depositions and court room testimony. These proceedings began with the administrator, the son of the deceased, believing that Cluney was the widow of his father. Cluney allowed that misunderstanding to continue until its falsity was independently discovered.

### B. Falsity.

¶12. During depositions, Cluney was confronted with a marriage license that established that she had indeed been a party to a previous marriage. Cluney also admitted that her marriage to Raymond Cluney had not been dissolved.

### C. Materiality.

¶13. The factors of materiality and reliance appear closely related. One interpretation of the factors could be that any misrepresentation relied upon by the person defrauded must for that reason have been material. However, that would make materiality and reliance but one factor. We find instead that "materiality" is an objective matter, unrelated to what the person deceived actually thought. It asks whether the misrepresented fact is a significant one. If Cluney had told Law that she was born in 1955 or in 1951, when in fact she was born in 1953, such an intentional misstatement would not likely be material to the conveyance of property. A grantor might still claim that he relied upon the incorrect age. The two factors will usually be joined, in that a person defrauded would not often rely on an immaterial untruth. Yet, if such reliance occurs such as on a minor misstatement of age, the question of materiality becomes independently important.

¶14. We have no doubt that a false statement about Cluney's marital status was material to Law's interest in marrying her. We also find whether Law was actually married to Cluney is objectively material to whether he would want to leave his house to her at his death.

### D. Knowledge, Intent & Ignorance of Falsehood.

¶15. It is an almost unavoidable inference that Cluney knowingly misrepresented herself to be a single woman, and that Law was ignorant of the falsehood. What is less an inevitable inference is that Cluney misrepresented her marital status with the intent to induce Law to convey property to her. Still, that too might be inferred from circumstantial evidence.

¶16. The chancellor made no finding that she interpreted this evidence to mean that the intent behind Cluney's misrepresenting her marital status was to acquire part of Law's property. There is no requirement that the intent for all the ultimate consequences exist from the first misrepresentation. A deed to property may not initially have been contemplated by the deceiver. It would be enough that by the time a deed of property began to be discussed by the parties, that the misrepresentation was continued with the intent of inducing the conveyance. In addition, the initial intent may be general, to acquire such benefits as become available as a result of the falsehood.

¶17. We find that Cluney's intent to acquire what benefits as may come her way may fairly be implied from the fact of the deception itself. A person may seek shelter, money, and other comforts from the friendship that can be created with someone capable of providing those benefits. If in addition to seeking mere friendship, the acquiring party misrepresents marital status and permits a wedding to occur, the inference can arise that an intent exists to obtain the more substantial benefits arising from marriage.

¶18. A contrary inference could have been reached, but we find enough in the record to imply the finding on this point that is necessary to uphold the judgment.

### E. Injury.

¶19. Law's estate maintains that because of this misrepresentation, the rightful heirs to the property were deprived of part of their inheritance. That is sufficient injury.

### F. Reliance.

¶20. To prevail on this element it must be shown that Law relied on the misrepresentation. Not every spoken untruth is actionable as fraud. It is only if that untruth by design and effect induced the hearer to

change his position in justifiable reliance on the information. *McGee v. Swarek,* 733 So. 2d 308, 312 (Miss. Ct. App. 1998). There is no direct evidence that Law conveyed the residence only because he thought Cluney was his wife. Mr. Law's sister testified that he had told her after the wedding that he would convey Cluney his house because he was not able to care for himself. The implication was that the conveyance was in exchange or in gratitude for the care that she was providing, which included cooking, cleaning, and other household chores. She also stated this:

> Q. [D]id [Law] ever make the statement to you because Dolores is my wife, I am deeding her the property?
>
> A. No, sir, no, sir.
>
> Q. What did he tell you or why did he tell you he was deeding the property to Dolores?
>
> A. Because - - so that she would take care of him until he died.

¶21. Mr. Law's aunt also testified. She stated that even before the ineffective ceremony took place, Law stated that he wanted Dolores to have his residence.

¶22. There was no other evidence about Law's intentions, state of mind, or other relevant fact in determining why he would want to convey the property to Cluney. The chancellor made a finding that the misrepresentation was material to Law. We interpret that finding as meaning that Law relied on the existence of the marriage in deciding to execute the deed. We accept that proof of reliance could be through inferences. That the marriage was not important to the decision also can arise from inferences.

¶23. There was evidence that Law wanted Cluney to have the land in return for the care that she provided to him while he was alive. Testimony established Law had numerous health problems such as hypertension, back problems and poor eyesight. Cluney took care of most of Law's personal needs from 1992 until his death in 1999, which includes time both before and after the purported marriage. In addition, there was testimony from Law's aunt that prior to the wedding Law said that he was going to give Cluney the home so that she would have a place to stay.

¶24. The chancellor appeared to rely on the fact that the deed twice refers to Cluney as Law's wife: "we, George W. Law and wife Delores Law, do hereby convey and warrant unto George W. Law and wife, Delores Law . . . ." To us, those references create no inference that Law relied on the marriage in making the conveyance. They are descriptions of the parties which shed no light on whether the truth of that description was central to the desire to execute the deed. The deed also twice named his supposed wife as "Delores." If it later became known that her actual name was Jane, we would not infer that since he called her Delores in the deed, that her actual name was central to the conveyance. A mere description does not reasonably create an inference of reliance on the truth of the description; it only reveals belief in it. Mr. Law thought that Cluney was his wife. Not to refer to her as such in a legal instrument might have been suggestive of purpose or even of doubt. However, we find no useful inference from employing the natural description.

¶25. The record also shows that for about sixteen months the couple lived together without the formality of a marriage. After the wedding, the two lived together without the reality of a marriage. There is no statement from Mr. Law that he was conveying the property because of the marriage.

¶26. The reliance issue is in essence a focus on proximate cause. Would Law have deeded the property

had the couple just continued to live together without having gone through the process of a marriage? The chancellor found that Law would not have done so, but she had very little on which to base that conclusion.

¶27. We do not find that the chancellor could conclude that there was clear and convincing evidence that Law conveyed this house only because of the marriage. The unimpeached evidence was that Cluney was quite helpful to Law, that he was willing to live with her for an extended period of time without the benefit of marriage, that he told at least two people that he wanted to leave his house to Cluney because of the care that she was providing, and that Law's aunt was told this before the wedding. The estate points out that the deed was not executed until after the wedding, but that by itself is opaque and unconvincing evidence of the necessity of marriage for the deed.

¶28. The principal basis on which the chancellor's decision must have rested was speculation that Law would not have wanted to leave his house to Cluney had he known that they were not actually married. There was no evidence of such an intent. There also was too much evidence to the contrary, including that marriage did not seem central to his relationship with Cluney.

¶29. What exactly Cluney had in mind may be questioned. Yet, what the estate failed to do was to demonstrate that Mr. Law had in mind executing a deed only because he thought Cluney was his wife. It was the estate's burden to prove Law's reliance, and it failed. Therefore, we reverse the chancellor's decision to set aside this deed. We reinstate the deed and find that it validly conveyed to Cluney the survivorship interest in the property described.

¶30. **THE JUDGMENT OF THE CHANCERY COURT OF MONROE COUNTY SETTING ASIDE THE CONVEYANCE OF REAL PROPERTY ON THE BASIS OF FRAUD IS REVERSED AND THE DEED IS REINSTATED. ALL COSTS ARE ASSESSED TO THE APPELLEE.**

> **McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, AND IRVING, JJ., CONCUR. LEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MYERS AND BRANTLEY, JJ. CHANDLER, J., NOT PARTICIPATING.**

> LEE, J., DISSENTING:

¶31. The majority finds that no evidence existed to show that Cluney defrauded her supposed husband in efforts to entice him into conveying the property to her; thus, the chancellor erred in cancelling the deed. I disagree.

¶32. The record shows that Cluney was a less than honest person, lying to the court concerning her prior marriage as well as her education and the use of her name. Cluney now argues on appeal that this Court should believe that, although she lied previously to the chancellor, she is being honest in her assertion that Law's reason for conveying the property to her was his affection for her. Plus, she claims that no proof existed to show that the conveyance was solely based on Law's belief that the two were married. I am not swayed to approve Cluney's argument.

¶33. The majority cites the standard that fraud must be proven by clear and convincing evidence and, in its recitation of the "fraud" factors, finds that no direct evidence exists to show that Law conveyed the residence only because he thought Cluney was his wife. In reciting the factors, the majority finds that the first six factors weigh against Cluney, but the seventh factor, reliance, is apparently so significant as to

"cancel out" the other findings which the majority concludes supports a finding of fraud. I cannot agree.

¶34. Cluney knowingly misrepresented the fact that she was not married, lying both to Law and even committing perjury before the chancellor, the false representation was material, Law was ignorant of Cluney's ongoing deception, and Law's heirs were harmed by Cluney's deception. Reliance is but one factor in this list of many to consider when determining whether to set aside a conveyance due to fraud. I find the majority places too much weight on the "reliance" factor, to the detriment of the other factors which convincingly indicate that Cluney undoubtedly perpetrated a fraud on Law in efforts to gain his property.

¶35. I believe the question of whether or not Law relied wholeheartedly on his presumption of marriage to Cluney is not so important as to overshadow what really happened here: Cluney lied to Law about a material fact and, in turn, she has been "rewarded" by receiving the benefit of her betrayal. With the majority's conclusion, I find that we are slapping Cluney on the wrist for her deceit, yet rewarding her in allowing her to keep the "booty."

¶36. Bigamy is bigamy, and Cluney broke the law by conning Law into marrying her when she knew the marriage was not legal. With the majority's decision, I am disheartened to find that we are essentially aiding and abetting the wrongdoer. I would find that sanctions are in order against Cluney, as well as find that the chancellor's decision to set aside the conveyance should be affirmed. Thus, I dissent.

**MYERS AND BRANTLEY, JJ., JOIN THIS SEPARATE WRITTEN OPINION.**